UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| DARIAN OWENS, | Case No. 3:21-cv-00307-MMD-CSD |
| Petitioner, | ORDER |
| v. | |
| WILLIAM A. GITTERE, *et al.*, | |
| Respondents. | |

I.    **SUMMARY**

Petitioner Darian Owens filed an amended petition for writ of habeas corpus under 28 U.S.C. § 2254.[1] (ECF No. 18 ("Petition").) This matter is before the Court for adjudication on the merits of the remaining grounds in the Petition. For the reasons discussed below, the Court grants a writ of habeas corpus for Ground 1; denies the remaining grounds of the Petition; and denies a Certificate of Appealability.

II.    **BACKGROUND**

A.    **Conviction and Appeal**

In November 2015, following a jury trial, a Nevada district court entered judgment convicting Owens of 32 counts: nine counts of conspiracy to commit robbery, 11 counts of burglary while in possession of a firearm, 10 counts of robbery with use of a deadly weapon (some counts involving victims 60 years of age or older), one count of attempted robbery with use of a deadly weapon, and one count of possession of a firearm by an ex-felon. (ECF Nos. 22-36; 22-37.) The state district court sentenced Owens to 32 consecutive terms of life without the possibility of parole under the large habitual criminal

---

[1]According to the state corrections department's inmate locator page, Owens is currently incarcerated at High Desert State Prison ("HDSP"). *See* https://ofdsearch.doc.nv.gov/form.php. Jeremy Bean is the warden of that facility. *See* https://doc.nv.gov/Facilities/HDSP_Facility/. The Court directs the Clerk of Court to substitute Bean for Respondent Gittere under Federal Rule of Civil Procedure 25(d).

1    statute. (ECF No. 22-39.) The Nevada Court of Appeals affirmed judgment on direct

2    appeal. (ECF No. 23-28.)

3              **1.    Facts Underlying Conviction[2]**

4              From June 2014 to August 2014, a series of 11 robberies occurred across multiple

5    Las Vegas grocery stores. The robberies primarily involved multiple individuals targeting

6    the gaming areas within the stores.

7              On June 16, 2014, two individuals wearing hoodies with bandanas covering their

8    faces robbed the gaming area of the Smith's located on 6855 Aliante Parkway in North

9    Las Vegas, pointing a handgun at the clerk and ordering her to open the cash drawer. On

10   June 25, 2014, two individuals entered the gaming area of the Albertsons located at 1650

11   North Buffalo with handguns and one of the individuals ordered the clerk to give him the

12   money in the cash drawer. On July 15, 2014, two individuals ran up to an employee in the

13   parking lot of the Smith's located at 2255 Easy Centennial. The individual in a red

14   sweatshirt pointed a gun and instructed the employee to follow them into the store.

15   Because the employee could not open the cash registers, the two individuals left. During

16   later interviews with detectives, Owens identified himself in store surveillance camera

17   photographs as the male suspect wearing a red hooded sweatshirt at each of these

18   locations.

19             On July 19, 2014, two individuals robbed the Smith's located at 2111 North

20   Rampart, instructing a 78-year-old employee to open and empty the cash drawers. Both

21   individuals wore hooded sweatshirts, one of which was red. On July 21, 2014, multiple

22   individuals robbed the gaming area at the Smith's located at 8555 West Sahara with a

23   gun, instructing the 86-year-old employee to give them all the money. Owens identified

24   himself as the individual in the black hooded sweatshirt in photographs from the store

25   surveillance camera.

26   ///

27

28            [2]The facts underlying the conviction are derived from the State's answering brief
     on direct appeal. (ECF No. 23-22 at 9-16.)

Two robberies occurred on July 25, 2014. The first robbery took place at the Terribles located at 8495 Blue Diamond Road, where two individuals with a gun approached the 72-year-old employee, demanding money from the cash register. Thirty minutes later, two individuals robbed the Smith's located at 2385 Eastern. Because no employee was working the gaming area, the individuals demanded that an employee at a nearby check stand open and empty the cash register. On August 9, 2014, a single man with a handgun robbed the Shortline Express located at 6698 Sky Pointe Drive. On August 12, 2014, a man with a handgun robbed the 7-Eleven located at 835 Seven Hills in Henderson. On August 19, 2014, two individuals robbed the Quicky's at 4400 North Jones. Owens again identified himself in surveillance photographs at each location.

On August 25, 2014, two individuals robbed the Rebel gas station at 7191 West Craig Road. One of the men pointed a handgun at the employee, instructing her to give him money from the register. The employee called 9-1-1 and followed the men after they left the store. Detectives, who had been surveilling Owens, followed the individuals, who drove away in a red Toyota Prius. Detectives tracked the vehicle until it was ditched in a cul-de-sac and the two men fled on foot. The car's female driver, who was later identified as the suspect involved in the June 25, July 19, and July 21 robberies, was taken into custody. The two men jumped through a series of backyards until they entered a home. After the homeowner ran out to inform officers, the two men were taken into custody.

### B.    State Post-Conviction Proceedings and Federal Habeas Action

Owens filed a *pro se* state petition for writ of habeas corpus. (ECF No. 23-45.) The state district court denied post-conviction relief. The Nevada Supreme Court entered an order of limited remand, instructing the district court to provide an amended written order containing specific findings of fact and conclusions of law explaining the basis for denying relief. (ECF No. 24-13.)

Reviewing the amended order, the Nevada Supreme Court affirmed, in part, and reversed, in part, the district court's denial of post-conviction relief, remanding and directing the district court to consider claims it had determined were abandoned in error.

(ECF No. 24-26.) Following a hearing on the remaining claims, the district court denied relief. (ECF No. 24-29.) In July 2021, the Nevada Court of Appeals affirmed the denial of relief. (ECF No. 24-36.)

Owens initiated this federal habeas corpus proceeding *pro se*. (ECF No. 1.) Following appointment of counsel on initial review, Owens filed his counseled first amended petition. (ECF No. 18.) Respondents moved to dismiss certain claims as unexhausted, non-cognizable and/or conclusory, and the Court granted the motion in part, dismissing Ground 1(B), any substantive claims alleged in Ground 3, and Additional Grounds 1-6. (ECF No. 35 at 11.) The Court deferred consideration of whether Owens can establish cause and prejudice to overcome the default of Ground 3(B). (*Id.*)

## III.    LEGAL STANDARD

### A.    Review under the Antiterrorism and Effective Death Penalty Act

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in *habeas corpus* cases under the Antiterrorism and Effective Death Penalty Act (AEDPA):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is contrary to established Supreme Court precedent, within the meaning of § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of established Supreme Court precedent

under § 2254(d)(1) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (internal citation omitted) (quoting *Williams*, 529 U.S. at 409-10) (internal citation omitted).

The Supreme Court has instructed that a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75). *See also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt").

**B.    Standard for Evaluation of Ineffective Assistance of Counsel Claims**

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring Petitioner to demonstrate that: (1) the attorney's "representation fell below an objective standard of reasonableness[;]" and (2) the attorney's deficient performance prejudiced Petitioner such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). Courts considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. It is Petitioner's burden to show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth

Amendment." *Id.* at 687. Additionally, to establish prejudice under *Strickland*, it is not enough for Petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." *Id.* at 687.

Where a state district court previously adjudicated the claim of ineffective assistance of counsel under *Strickland*, establishing the decision was unreasonable is especially difficult. *See Richter*, 562 U.S. at 104-05. In *Richter*, the Supreme Court clarified that *Strickland* and § 2254(d) are each highly deferential, and when the two apply in tandem, review is doubly so. *See id.* at 105. *See also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (internal quotation marks omitted) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as doubly deferential."). The Court further clarified, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

## IV.    DISCUSSION

### A.    Ground 1—Disproportionate Sentence

In Ground 1, Owens alleges that the state district court's 32 consecutive sentences of life without the possibility of parole ("LWOP") violate the Eighth Amendment. (ECF No. 18 at 10-13.) He asserts that his sentence constitutes cruel and unusual punishment because it is grossly disproportionate to the crimes. (*Id*. at 12.) In addition, he asserts that his sentence is shocking for a non-murder case and is particularly shocking in comparison to his co-defendants' sentences. (*Id*. at 11.) One co-defendant entered into a guilty plea agreement and received a term of four to 13 years as well as a six-month aggregated sentence. (*Id*.) The other co-defendant also entered into a guilty plea agreement receiving an aggregated sentence of three to 12 years. (*Id*.) Owens further argues that he was sentenced as a habitual criminal based on prior robberies that occurred when he was

6

1  only 18 years old. (*Id*. at 12.)

2         **1.**    **Additional background information**

3       Owens's offenses occurred during the early morning hours between 12:30 a.m.

4  and 4:30 a.m. when few, if any, customers were patronizing the businesses. He

5  concealed his identity with a bandana or hood and used a firearm to threaten clerks,

6  demanding money from cash drawers. He either took the money himself, accepted it

7  when handed to him, or instructed the clerk to place it in a bag before he fled. Owens

8  threatened to shoot if clerks failed to cooperate and sometimes pointed the gun at the

9  clerk's head, face, nose, or back. In one instance, he shoved a clerk against a wall. On

10  one occasion, he left empty-handed because the register could not be opened, and on

11  another, he dropped a sack of money but retrieved it after his companion yelled for him

12  to do so. Owens also stole cigarettes in two instances, once taking several packs and

13  another time requesting only one pack, for which he thanked the clerk. The amounts

14  stolen from 10 businesses varied, with $275 recovered in one instance. Owens

15  apologized to a clerk during one robbery, expressing that he had to do it. Each incident

16  was captured on surveillance video and no shots were fired. No one was physically

17  harmed. However, one clerk became so nervous he quit working the graveyard shift for

18  a month. Four of the victims were over the age of 60 years.

19       Owens evaded capture until after police issued a media release including

20  surveillance video of one of the earlier burglaries and a Crime Stoppers tipster

21  anonymously identified Owens. Police obtained a warrant to attach a GPS device to

22  Owens's vehicle and conducted surveillance of Owens until his capture shortly after the

23  last burglary. Owens was cornered by police, including a K9 unit and a helicopter, in the

24  yard of a house in a cul-de-sac. The homeowner reported Owens and his brother broke

25  into the house, but Owens later stated they merely knocked on the back door.

26       Upon arrest, Owens immediately confessed to the last robbery and stated that his

27  brother and fiancée were not involved. He disclosed the location of his firearm, which

28  contained 15 bullets in the magazine, and claimed he never chambered a round. At the

police station under *Miranda* caution, Owens identified himself in surveillance photographs for 10 of the 11 burglaries, but stated he did not recall many of the details.

A Second Amended Indictment charged Owens with 11 counts of burglary while in possession of a firearm, nine counts of conspiracy to commit robbery, six counts of robbery with use of a deadly weapon, four counts of robbery with use of a deadly weapon, victim over 60 years of age, one count of attempted robbery with use of a deadly weapon, and one count of possession of a firearm by an ex-felon. (ECF No. 19-3.) Just before jury selection, the parties confirmed that Owens rejected an offer from the State to plead to three counts of robbery with use of a deadly weapon and burglary while in possession of a firearm, and stipulated to a sentence of 15 years to life imprisonment. (ECF No. 19-4 at 4-5.) The State informed the trial court that, if convicted at trial, Owens faced "[p]robably life without—every single robbery he's mandatory violent habitual because of his priors. So under 012 we have to seek it and you have to give it. So 10 to 25, 10 to life, or life without for every single robbery and there's 11 of them." (*Id.*) Owens confirmed he did not want to take a deal. (*Id.*)

Following Owens's conviction on all charges, a Presentence Investigation Report ("PSI") stated that Owens is a self-admitted member of the Donna Street Crips criminal street gang; and was 25 years old at the time of the offenses. (ECF No. 62-1 at 2-3.) Owens previously acquired three felony convictions in 2007 for robbery with the use of a deadly weapon for three separate cases, for which he served concurrent prison sentences until his release on February 14, 2014—less than four months before the crimes committed in the instant case. (*Id.* at 5-7.) Owens was 18 years old at the time he committed the 2007 offenses.

The PSI reported that none of the individual victims of the crimes in this case—12 in all—submitted claims or provided any information regarding the impact the crimes had on them. (*Id.* at 11.) The victim businesses reported a total of $7,218.77 was stolen. (*Id.*) One of the businesses reported its employees were afraid to return to work for fear of getting hurt during a robbery. (*Id.* at 27.) The PSI recommended that, if Owens was

1   adjudicated a large habitual criminal, he should be sentenced to 12 consecutive

2   sentences of 10 years to life imprisonment. (*Id.* at 24.)

3   At sentencing, the State insisted that because of Owens's three prior felony

4   robbery convictions, the district court has no discretion but to adjudicate him as a habitual

5   criminal. (ECF No. 22-38 at 3.) The State argued Owens should be given a sentence of

6   life without the possibility of parole and requested consecutive terms for each individual

7   robbery.[3] (*Id.*) The State noted that "these were all separate instances," and "many of

8   them involve these very violent acts occurring to victims who are well into their 80s." (*Id.*)

9   The defense argued sentencing that the robberies occurred during a four-month

10  period of Owens's life and that nobody was hurt during the events. (*Id.* at 4-5.) The

11  defense further argued that "a life tail is more than appropriate in this case," but that

12  Owens "should be afforded the opportunity to potentially see the light of day." (*Id.* at 5.)

13  The defense highlighted that Owens was still a young man who did not fully comprehend

14  the actions that he committed. (*Id.*) The district court made the following comments:

> You know, a 26-year-old young man, handsome, should be thinking about advancement in his employment, should have graduated from college, should—and yet what he does is he puts a gun in these old people's face that are merely trying to supplement their income, probably are minimum wage employees trying to just supplement their fixed income because they can't afford to live. And he chose to involve his girlfriend, who's in prison . . .
>
> . . . .
>
> But at a minimum, she's how had to have gone to prison. His brother has to go to prison because of his choices. You've got to live with your choices. I reviewed the Eighth Amendment to the Constitution because I thought, well, someone's going to argue that it might be cruel and unusual punishment, but, you know, it's not when you look at these 11 people. This is how people end up dead. We could be here on multiple murder charges.
>
> He used a deadly weapon, knew what he was doing . . . I don't think he thought ahead on what the consequence would be, and it's a sad day.

(*Id.* at 6.) The district court adjudicated Owens a habitual criminal and sentenced him to

32 consecutive LWOP sentences under the large habitual criminal statute. (*Id.* at 7-11.)

---

[3]At the time, defendants who qualified as a large habitual criminal, were subject to a sentence of imprisonment for (1) a definite term of 10 to 25 years; (2) 10 years to life with the possibility of parole, or (3) life without the possibility of parole. *See* NRS § 207.010(b), *as enacted by* Laws 1997, p. 1184.

1

### 2.    State court determination

2

In denying his appeal, the Nevada Court of Appeals held:

3

Owens claims his sentence of 32 consecutive terms of life without the
possibility of parole, imposed pursuant to the large habitual criminal statute,
constituted cruel and unusual punishment and shocks the conscience.
Owens claims the sentence is grossly disproportionate to the crimes, he
was only 26 when he was convicted, the crimes that made him eligible for
the large habitual criminal enhancement occurred when he was 18, and the
sentence was harsher than requested by the State.

4

5

6

7

Regardless of its severity, "[a] sentence within the statutory limits is not
'cruel and unusual punishment unless the statute fixing the punishment is
unconstitutional or the sentence is so unreasonably disproportionate to the
offense as to shock the conscience.'" *Blume v. State*, 915 P.2d 282, 284
(1996) (quoting *Culverson v. State*, 596 P.2d 220, 221-22 (1979); *see also
Harmelin v. Michigan*, 501 U.S. 957, 1000-01 (plurality opinion) (explaining
that the Eighth Amendment does not require strict proportionality between
crime and sentence; it forbids only an extreme sentence that is grossly
disproportionate to the crime).

8

9

10

11

12

The sentence imposed is within the parameters provided by the relevant
statute, *see* NRS 207.010(1)(b), and Owens does not allege that the statute
is unconstitutional. Owens had three previous convictions for robbery with
the use of a deadly weapon and, shortly after being released from prison
for those prior crimes, he committed this series of robberies with use of a
deadly weapon. We conclude that the sentence imposed is not grossly
disproportionate to the crimes committed and Owen's history of recidivism
and does not constitute cruel and unusual punishment. *See Ewing v.
California*, 538 U.S. 11, 29 (2003) (plurality opinion).

13

14

15

16

17

(ECF No. 23-28 at 2-3.)

18

### 3.    Applicable legal standard

19

The Eighth Amendment forbids sentences that are "grossly disproportionate" to

20

the crime. *Graham v. Fla.*, 560 U.S. 48, 59-60 (2010). In non-capital cases, a court must

21

first compare the gravity of the offense with the severity of the sentence to determine

22

whether it is one of the "rare" cases which leads to an inference of gross disproportionality.

23

*See id.* (citing *Harmelin v. Michigan*, 501 U.S. 957, 1005 (1991) (Kennedy, J.,

24

concurring)). *See also Solem v. Helm*, 463 U.S. 277, 289-92 (1983) (explaining that the

25

court weighs the criminal offense and penalty "in light of the harm caused or threatened

26

to the victim or society, and the culpability of the offender" and agreeing that "'[o]utside

27

the context of capital punishment, successful challenges to the proportionality of particular

28

sentences [will be] exceedingly rare . . . .'") (internal citation omitted). *See also Norris v.*

1  *Morgan*, 622 F.3d 1276, 1290 (9th Cir. 2010) (stating "[w]e compare the harshness of the

2  penalty imposed upon the defendant with the gravity of his triggering offense and criminal

3  history") (citing *Ewing v. California*, 538 U.S. 11, 28-29 (2003); *accord Ramirez v. Castro*,

4  365 F.3d 755, 767-70 (9th Cir. 2004)). "'[I]n the rare case in which . . . [the] threshold

5  comparison . . . leads to an inference of gross disproportionality' the court should then

6  compare the defendant's sentence with the sentences received by other offenders in the

7  same jurisdiction and with the sentences imposed for the same crime in other

8  jurisdictions." *Graham*, 560 U.S. at 60 (quoting *Harmelin*, 501 U.S. at 1005 (opinion of

9  Kennedy, J., concurring)). "If this comparative analysis 'validate[s] an initial judgment that

10  [the] sentence is grossly disproportionate,' the sentence is cruel and unusual." *Id.*

11  The Supreme Court has stated that "[r]eviewing courts . . . should grant substantial

12  deference to the broad authority that legislatures necessarily possess in determining the

13  types and limits of punishments for crimes, as well as to the discretion that trial courts

14  possess in sentencing convicted criminals." *Solem*, 463 U.S. at 290. Generally, as long

15  as the sentence imposed does not exceed statutory limits, it will not be overturned on

16  Eighth Amendment grounds. *See United States v. Parker*, 241 F.3d 1114, 1117 (9th Cir.

17  2001).

18  **4.  Analysis**

19  The Nevada appellate court unreasonably applied clearly established federal law

20  as determined by the United States Supreme Court to the facts in this case when it

21  determined the circumstances do not raise an inference that the sentence of 32

22  consecutive LWOP sentences is grossly disproportionate to the offenses.

23  **a.  Severity of the sentence**

24  Owens received 32 consecutive LWOP sentences. An LWOP sentence is the

25  second most severe penalty after the death penalty. *See Harmelin*, 501 U.S. at 1001

26  (Kennedy, J., concurring in part and concurring in judgment). Owens's sentence exceeds

27  the maximum punishment recommended in the PSI, which suggested a maximum of 12

28  consecutive sentences of 10 years to life imprisonment. (ECF No. 62-1 at 24.) It far

11

1  exceeds the State's original offer that Owens plead to three counts of robbery with use of

2  a deadly weapon and one count of burglary while in possession of a firearm with a

3  stipulated sentence of 15 years to life imprisonment. It also exceeds the State's request

4  at sentencing that Owens be given consecutive LWOP sentences for each incident. The

5  codefendants, while certainly less culpable and with less serious criminal histories, each

6  pleaded guilty to one count of conspiracy to commit robbery and one count of robbery

7  with use of a deadly weapon, receiving aggregate sentences of only three to 12 years

8  and four to 13.5 years respectively. (ECF Nos. 19-37; 19-38.) Under the circumstances,

9  the number of consecutive LWOP sentences imposed, even considering Owens's

10  criminal history and eligibility for large habitual criminal treatment, is rare and severe. The

11  Court has found no case in Nevada or any other state in which an individual was

12  sentenced to an equivalent number of consecutive LWOP sentences for similar crimes.

13  The impossibility of parole also supports an assessment that the sentence is severe.

14  Nevada law prohibits commutation of sentences to life with parole. *See* NRS §

15  213.085(2)(b), *as enacted by* Laws, 1995, p. 1258 ("If a person is convicted of any crime

16  other than murder of the first degree on or after July 1, 1995, the Board shall not commute

17  . . . [a] sentence of imprisonment in the state prison for life without the possibility of parole,

18  to a sentence that would allow parole.").

19      All objectively reasonable jurists would agree that the imposition of *more than 30*

20  consecutive LWOP sentences against Owens is severe and contributes to an inference

21  of gross disproportionality.

22                          **b.    Gravity of the offenses**

23      In weighing the severity of the sentence against the gravity of the offenses, a court

24  must consider both current offenses and criminal history. *See Ewing*, 538 U.S. at 29.

25  Defendants "who do not kill, intend to kill, or foresee that life will be taken are categorically

26  less deserving of the most serious forms of punishment than are murderers." *Graham*,

27  560 U.S. at 69. "There is a line 'between homicide and other serious violent offenses

28  against the individual.'" *Id.* (quoting *Kennedy v. Louisiana*, 554 U.S. 407, 438 (2008)).

"[A]lthough an offense like robbery or rape is 'a serious crime deserving serious punishment,' those crimes differ from homicide crimes in a moral sense." *Id.* (internal citation omitted). *See also Graham*, 560 U.S. at 91 (Roberts, J., concurring in judgment) (recognizing armed burglary of a nondomicile with an assault or battery is a serious crime deserving serious punishment, as is home invasion robbery, but both are less serious than murder or rape). "If more serious crimes are subject to the same penalty, or to less serious penalties, that is some indication that the punishment at issue may be excessive." *Solem*, 463 U.S. at 291.

In Nevada, LWOP sentences are typically authorized for the more serious crimes involving physical harm.[4] Moreover, there are serious crimes involving physical harm in Nevada that do not authorize an LWOP sentence, such as second-degree murder, which permits a maximum sentence of 10 years to life (allowing for parole after 10 years) (NRS

---

[4]Some of the crimes in Nevada for which an LWOP sentence was authorized under certain circumstances at the relevant time were: First-Degree Murder (NRS § 200.030(4)(b)(1)); First-Degree Kidnapping (NRS § 200.320(1)(a)); Sexual Assault (NRS § 200.366(2)(a)(1) *as enacted by* Laws 2007, c. 528 § 7); Battery with Intent to Commit Sexual Assault resulting in substantial bodily harm or committed by strangulation (NRS § 200.400(4)(a)(1) *as enacted by* Laws 2009, c. 42, § 2, eff. May 6, 2009); Death Resulting from Duel (NRS § 200.030; 200.410); Death Resulting from Challenges to Fight (NRS §§ 200.030; 200.450(3)); Act of Terrorism (NRS § 202.445(3)(a)(1)); Crimes involving weapons of mass destruction, biological or chemical agents, or similar lethal agents resulting in substantial bodily harm or death (NRS § 202.446(3)(b)(1)); Providing a controlled substance that causes death (NRS § 200.030; 453.333 *as enacted by* Laws 1995, p. 1285); Unlawful manufacturing of a controlled substance resulting in death to another person during discovery or cleanup of a premises (NRS § 453.3353 *as enacted by* Laws 2005, c. 266, § 1, eff. June 6, 2005); Using explosives to destroy an occupied property or vehicle (NRS § 202.830(2)(a)); Commission of felony to aid an act of terrorism resulting in substantial bodily harm or death (NRS § 193.1685(3)(a)); and Procuring the execution of an innocent person by perjury (NRS § 199.160).

§ 200.030(5)).[5] An LWOP sentence was not authorized for any of Owens's offenses,[6] only the large habitual criminal statute authorized it due to Owens's three prior convictions. *See* NRS § 207.012 *as amended by* Laws 2013, c. 354, § 6.

Few instances exist where a defendant in Nevada was sentenced to multiple consecutive LWOP sentences for crimes of the nature at issue here—even where the defendant qualified for punishment as a recidivist. And remarkably, the number of consecutive LWOP sentences in those cases do not approach the high number of consecutive LWOP sentences imposed against Owens. *See, e.g.*, *Jones v. State*, 134 Nev. 965, 2018 WL 3218014, (Docket No. 73622) (Nev. App. June 19, 2018)

---

[5]For vehicular homicide, the maximum authorized sentence was life with parole eligibility in 10 years. *See* NRS §§ 484C.130 *enacted legislation substituted in 2009 revision for part of* NRS § 484.37955; 484C.440. At the relevant time, an individual who killed someone while driving under the influence of alcohol or a controlled substance could be sentenced to a minimum term of two years and a maximum term of not more than 20 years. *See* NRS § 484C.430. A sentence of life with parole eligibility in 15 years was authorized for pandering a child under 14. *See* NRS § 201.300 *as enacted by* Laws 2013, c. 426, § 42, eff. July 1, 2013. A conviction for first degree kidnapping where the victim suffers no substantial bodily harm could garner a life sentence with parole eligibility after five years. *See* NRS § 200.320.

[6]Conspiracy to commit robbery was punishable for imprisonment for one year with a maximum term of six years. *See* NRS §§ 199.480 *as enacted by* Laws 2013, c. 426, § 30, eff. July 1, 2013; 200.380 *as enacted by* Laws 1995, p. 1187. Burglary while in possession of a firearm was punishable by imprisonment for a minimum of two years and a maximum of up to 15 years, plus a consecutive minimum term of not less than one year and a maximum term of not more than 15 years for the deadly weapon enhancement. *See* NRS §§ 193.165; 205.060 *as enacted by* Laws 2013, c. 488 § 1. Robbery with use of a deadly weapon was punishable by imprisonment for a minimum of two years and a maximum of 15 years, plus a consecutive minimum term of not less than one year and a maximum term of not more than 15 years for the deadly weapon enhancement. *See* NRS §§ 193.165; 200.380 *as enacted by* Laws 1995, p. 1187. Attempted robbery with use of a deadly weapon was punishable by imprisonment for a minimum of one year and a maximum of 10 years, plus a consecutive minimum term of not less than one year and a maximum term of not more than 10 years for the deadly weapon enhancement. *See* NRS §§ 193.165; 193.330 *as enacted by* Laws 1997, p. 1178; 200.380 *as enacted by* Laws 1995, p. 1187. Possession of a firearm by an ex-felon was punishable by imprisonment for a minimum term of one year and a maximum of six years. *See* NRS § 202.360 *as enacted by* Laws 2003, c. 256 § 7. Robbery with use of a deadly weapon, with a victim 60 years of age or older was punishable as a robbery for a minimum of two years and a maximum of 15 years, plus a consecutive term for not less than one year and a maximum term of not more than 20 years. *See* NRS §§ 193.167 *as enacted by* Laws 2013, c. 110, § 1; 200.380 *as enacted by* Laws 1995, p. 1187. *But see Barrett v. State*, 775 P.2d 1276, 1278 (1989) (recognizing a district court may not enhance a primary substantive offense under more than one enhancement statute)*; Carter v. State*, 647 P.2d 374, 377 (1982) (holding sentencing court may not impose consecutive enhancement penalties under NRS § 193.165 and NRS § 193.167 for the same offense).

14

(unpublished) (seven consecutive LWOP sentences, and 28 concurrent LWOP sentences for crimes against 13 businesses, including robbery of individual patrons and employees, resulting in 12 convictions for burglary while in possession of a firearm, 19 counts of robbery with the use of a deadly weapon, and convictions for burglary, robbery, and attempted robbery with use of a deadly weapon); *Eagles v. State*, 410 P.3d 981 (Table) (Docket No. 71154) (Nev. Sup. Court, January 24, 2018) (unpublished) (four consecutive LWOP sentences as a habitual criminal for conspiracy to commit robbery, robbery, battery with substantial bodily harm, and battery with intent to commit a crime); *Hughes v. State*, 996 P.2d 890, 892 (2000) (three consecutive LWOP sentences for robbery with use of a deadly weapon).

In other states, multiple consecutive LWOP sentences also typically accompany more serious crimes, e.g., murder, kidnapping, and sexual assault (including assault on minors). Far fewer cases involve multiple consecutive LWOP sentences for crimes such as those committed by Owens—even considering sentences imposed under recidivist statutes—and the Court found none imposing this high number of consecutive LWOP sentences for crimes like those here. *See e.g.*, *State v. Bailey*, Case No. W201402517CCAR3CD, 2016 WL 269851, at 1-3 (Tenn. Crim. App. Jan. 11, 2016) (seven LWOP sentences, including one consecutive LWOP sentence, for aggravated robberies, as a repeat and violent offender under three strikes law); *Esco v. State*, 102 So. 3d 1209, 1211 (Miss. Ct. App. 2012) (LWOP sentences on all counts, including two consecutive LWOP sentences, for aggravated assault, armed robbery, conspiracy to commit aggravated assault, conspiracy to commit armed robbery, possession of a firearm by a prior convicted felon, and felony evasion); *Sandridge v. State*, Case No. W200900261CCAR3PC at 4 (Tenn. Crim. App. Sept. 18, 2009) (consecutive LWOP sentences as repeat offender for aggravated robbery with a deadly weapon with conviction for which defendant was on parole); *State v. Floyd*, 353 S.C. 55, 56-57, 577 S.E.2d 215, 215 (2003) (LWOP sentences for two defendants convicted of two counts of hostage-taking).

Owens's criminal history includes three prior felony convictions for robbery with a firearm, committed at age 18, when his "culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity." (ECF No. 62-1 at 5-6.) *See Graham*, 560 U.S. at 91 (Roberts, J., concurring in judgment) (quoting *Roper v. Simmons*, 543 U.S. 551, 557 (2005). Owens served out his prison term, and nothing indicates he was a troublemaker in prison. (ECF No. 62-1 at 7.) The record establishes that he started committing the instant offenses roughly four months after he was discharged from prison, when he was about 25 years old. (*Id.* at 3, 7.) The instant offenses involved pointing a firearm at employees, some elderly—certainly a serious crime. But it is nevertheless relevant that no physical harm occurred. Owens confessed immediately upon arrest and cooperated with the authorities by identifying himself in surveillance photographs for 10 of the 11 burglaries. Owens's criminal history and crimes establish he acted dangerously and deserves punishment. But this does not mean his crimes are indistinguishable from those of someone who committed, for example, 32 murders or rapes. And it does not mean he deserves a more severe punishment than similar defendants who committed the same types of offenses.

All objectively reasonable jurists would conclude this is a rare instance where the severity of the sentence, compared to the gravity of the offenses, raising an inference of gross disproportionality. Accordingly, the state appellate court's determination to the contrary is objectively unreasonable, and this Court will conduct de novo review of the second step of the Eighth Amendment proportionality analysis.

### c.    Intrajurisdictional and Interjurisdictional Comparisons

Because there is an inference of gross disproportionality, the Court is required to undertake intrajurisdictional and interjurisdictional comparisons of Owens's sentence to determine whether they confirm the threshold inference of disproportionality. *See Graham*, 560 U.S. at 60 (quoting *Harmelin*, 501 U.S. at 1005 (Kennedy, J., concurring in part and concurring in judgment)).

///

1    A comparison of Owens's sentence with the sentences of others in the same

2    jurisdiction logically starts with sentences received by Owens's two co-defendants. One

3    co-defendant received an aggregate sentence of four to 13.5 years; and the other co-

4    defendant received an aggregate sentence of three to 12 years. (ECF No. 18 at 10-13.)

5    Even accounting for the fact that the co-defendants were less culpable, had far less

6    severe criminal histories, and pled guilty while Owens rejected an offer to plead only to

7    four of the charges with a stipulated sentence of 15 years to life imprisonment, the total

8    sentence imposed on Owens was grossly disproportionate to those of his co-defendants.

9    That the LWOP sentences are grossly disproportionate is further reflected by the State's

10   own assessment of Owens's culpability versus the codefendants', as indicated in the

11   State's plea offer, which did not suggest a single LWOP sentence.

12        As discussed, the Court's brief survey reveals no intrajurisdictional state cases

13   involving a comparable number of consecutive LWOP sentences for similar types of

14   offenses. *See supra* pp. 14-15. The *Jones* case is the most comparable and confirms the

15   gross disproportionality of the sentence imposed against Owens.[7] *See Jones*, 134 Nev.

16   Jones, like Owens, was sentenced under the large habitual criminal statute for multiple

17   episodes involving armed robbery and burglary for which no one was physically harmed.

18   Jones was sentenced to 35 LWOP sentences, but only seven were consecutive LWOP

19   sentences, for offenses involving 13 businesses and robbery of the possessions of

20   individuals. In comparison, Owens was sentenced to 32 consecutive LWOP sentences

21   for offenses involving 11 businesses, and he did not directly rob individuals of their

22   personal possessions. Owens immediately cooperated, confessed to his involvement in

23   10 of the 11 burglaries, and led police to the location of the firearm he used to commit the

24   offenses. There is thus a significant disparity in the number of consecutive LWOP

25   sentences imposed for Owens (32) versus Jones (seven) given the offenses. Owens also

26   had a less serious criminal history than Jones yet he received a far more serious

27

28        [7]The Court takes judicial notice of the publicly available documents contained in
Nevada Court of Appeals's Docket No. 73622 for the *Jones* case, 73622-COA & 73622.

17

sentence. Jones was on parole at the time of the offenses; whereas Owens, who was recently released from prison, was not under any form of supervision, either through parole or probation, at the time of the offenses—yet Owens received a harsher sentence than Jones. Jones also had a criminal history that included two probation revocations and three parole revocations, whereas Owens had no prior revocations of either kind. Moreover, Owens appears to have a more limited criminal history than Jones, yet Owens was given a far harsher sentence.

As also previously discussed, the Court's survey reveals no interjurisdictional state cases involving a comparable number of consecutive LWOP sentences for similar types of offenses. *See supra* p. 15.

In sum, under the circumstances, the Court concludes Owens's sentence is grossly disproportionate in violation of the Eighth Amendment. The Court will accordingly grant relief for Ground 1.

### B.        Ground 2—Prosecutorial Misconduct

In Ground 2, Owens alleges that the State committed prosecutorial misconduct and violated his right to a fair trial by referencing Owens as a repeat offender in closing argument. (ECF No. 18 at 13-16.) In addition, Owens alleges that the State elicited testimony from an officer referencing an uncharged bad act that Owens committed a home invasion on the night of his arrest. (*Id.* at 16.) Owens asserts that the cumulative effect of the acts of prosecutorial misconduct violated his right to a fair trial. (*Id.* at 16-17.)

#### 1.        Additional background information

#### d.        Uncharged bad act

Officer Ryan Petersen testified at trial. During direct examination, Petersen testified regarding the night of Owens's arrest as follows:

> Eventually those males come to the center house that's right here and we lost sight of them underneath this little awning that was right there. But the homeowner came running out and talked to one of the detectives that was set up over here saying that two males had just broken into his house. The males eventually jumped back into this house that's right here where they were taken into custody.

18

1     (ECF No. 22-30 at 9.)

2                    **e.    Repeat offender reference**

3        At closing, the State referenced "ROP" detectives twice. ROP is an acronym for

4 the repeat offender program. The State argued at closing that "[t]he last robbery in the

5 series is the Angel Delgarza. They were practically caught red-handed as to this one. The

6 ROP detective missed him by seconds." (ECF No. 22-35 at 12-13.) The State also argued

7 regarding Owens's co-defendant that "the ROP detective surveilled her getting into the

8 driver's seat at the Von's on Lake Mead and Buffalo just before this robbery occurred."

9 (*Id*. at 13-14.)

10                  **2.    State court determination**

11        In regard to the claim of prosecutorial misconduct based on eliciting testimony on

12 an uncharged bad act, the Nevada Court of Appeals held:

13        Owens claims the State committed prosecutorial misconduct during trial by
       eliciting a reference to an uncharged bad act, a home invasion that occurred

14        just prior to Owen[s]'s arrest, without first requesting a *Petrocelli* hearing.
       We review claims of prosecutorial misconduct for improper conduct and

15        then determine whether reversal is warranted. *Valdez v. State*, 196 P.3d
       465, 476 (2008). We review improper conduct claims for harmless error. *Id.*

16

       We conclude the State did not commit misconduct in this regard. [FN 1] The
17        record demonstrates the State did not elicit the reference to the uncharged
       bad act. The witness made reference to the uncharged bad act in a

18        nonresponsive answer to the question asked by the State. However, even
       assuming there was error, we conclude the error was harmless because the

19        reference to the uncharged act was fleeting. *Collman v. State*, 7 P.3d 426,
       437-38 (2000) (noting when the reference to a defendant's past criminal

20        activity was fleeting any error was harmless), the district court gave a
       limiting instruction at the close of evidence regarding uncharged conduct,

21        and the evidence presented at trial established overwhelming evidence of
       Owens' guilt. Owens, after being arrested told police officers he was the

22        person who committed the crimes. He also told the officers where to find
       the gun used in the robberies. He later identified himself on most of the

23        video surveillance tapes as being the person with the firearm during the
       robberies.

24

25           [FN1] Contrary to the State's claim, this home invasion testimony was
          not properly admitted as res gestae because there was no need to elicit

26           the home invasion testimony in order to describe the crime charged. . .
          . The alleged home invasion occurred after the crimes in question were

27           committed and was not necessary to describe the crime charged.
          (internal citation and quotation omitted).

28

    (ECF No. 23-28 at 3-4.)

1    Regarding the prosecutorial misconduct claim based on reference to Owens as a

2    repeat offender, the Nevada Court of Appeals held:

3        Owens claims the State committed prosecutorial misconduct during closing
         arguments by twice referring to detectives as "ROP" detectives which
4        informed the jury Owens was a repeat offender. We conclude the State did
         not commit prosecutorial misconduct by referring to the detectives as "ROP"
5        detectives. The jury was never informed "ROP" means repeat offender
         program and, therefore, the State's reference to "ROP" did not convey to
6        the jury Owens was a repeat offender.

7    (*Id*. at 5.)

8    Finally, regarding cumulative error of claims of prosecutorial misconduct, the

9    Nevada Court of Appeals held:

10       Owens argues the cumulative errors of prosecutorial misconduct warrant
         reversal. However, we reject this claim because even assuming there was
11       error, the error was harmless. *See United States v. Sager*, 227 F.3d 1138,
         1149 (9th Cir. 2000) ("One error is not cumulative error.").
12

13   (*Id*. at 5-6.)

14                    **3.    Applicable legal standard**

15   Prosecutorial misconduct warrants federal habeas relief if the prosecutor's actions

16   "so infected the trial with unfairness as to make the resulting conviction a denial of due

17   process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citation and internal quotation

18   marks omitted). A defendant's constitutional right to due process of law is violated if

19   the prosecutor's misconduct renders a trial "fundamentally unfair." *Id*. at 181-83. *See*

20   *also Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process

21   analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the

22   culpability of the prosecutor."). Claims of prosecutorial misconduct are reviewed "on the

23   merits, examining the entire proceedings to determine whether the prosecutor's [actions]

24   so infected the trial with unfairness as to make the resulting conviction a denial of due

25   process." *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (citation and internal

26   quotation marks omitted). *See also Greer v. Miller*, 483 U.S. 756, 765 (1987); *Turner v.*

27   *Calderon*, 281 F.3d 851, 868 (9th Cir. 2002). If there is constitutional error, a harmless

28   error analysis is applied; the error warrants relief if it "had substantial and injurious effect

1    or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637-

2    38 (1993) (citation and internal quotation marks omitted); *Wood v. Ryan*, 693 F.3d 1104,

3    1113 (9th Cir. 2012).

4                                    **4.    Analysis**

5         The Nevada appellate court's decision is not contrary to, nor an unreasonable

6    application of federal law as determined by the United States Supreme Court and is not

7    based on unreasonable determinations of fact in the state court record.

8                            **a.    Uncharged bad act**

9         As stated by the Nevada appellate court, the State did not elicit the reference to

10   the uncharged bad act, but the witness nonetheless referenced the uncharged bad act in

11   his nonresponsive answer to the State's question. Petersen testified about the night that

12   Owens was arrested, such as the detectives' surveillance of Owens, which included

13   testimony regarding an air unit and review of multiple exhibits. Although his testimony

14   included the reference to the uncharged bad act, the reference was so brief and fleeting

15   as to have no appreciable prejudicial impact. In addition, the district court instructed the

16   jury to disregard reference to any other acts that were not charged in the indictment. (ECF

17   No. 22-32 at 37.) The United States Supreme Court has long held that "[a] jury is

18   presumed to follow . . . [and] is [also] presumed to understand" a judge's instructions."

19   *Weeks v. Angelone*, 528 U.S. 225, 235 (2000).

20        Moreover, the prosecution presented strong evidence that Owens committed the

21   robberies. *See Darden,* 477 U.S. at 181-82 (analyzing a claim that the prosecutor's

22   argument violated due process by considering the strength of the evidence against the

23   defendant). Considering witness testimony that Owens confessed to committing the

24   robberies, including identifying himself in photographs from store surveillance video, the

25   Court cannot conclude that the actions of the prosecutor "so infected the trial with

26   unfairness as to make the resulting conviction a denial of due process." *Id*. The Court

27   finds that the Nevada appellate court reasonably found that Petersen's testimony

28

                                              21

1    referencing a potential uncharged bad act was harmless in view of the admissible

2    evidence that established Owens's guilt.

3                              **b.    "ROP" reference**

4          Although the State referred to the detectives as "ROP" detectives twice during

5    closing, the State did not inform the jury that the "ROP" acronym stood for the repeat

6    offender program. As stated by the Nevada appellate court, reference to the acronym

7    "ROP" when mentioning "ROP" detectives did not convey to the jury that Owens was a

8    repeat offender. Considering the entire proceeding and the overwhelming evidence of

9    Owens' guilt, it was objectively reasonable for the Nevada court of appeals to conclude

10   that the State's challenged remarks referring to "ROP" detectives did not infect the entire

11   proceeding.

12                             **c.    Cumulative error**

13         The Nevada court of appeals concluded that even if there was error, the error was

14   harmless. Owens has not demonstrated multiple errors to cumulate. He has not shown

15   that the appellate court's decision was objectively unreasonable. The prosecutorial

16   misconduct did not infect the trial with such unfairness as to make the resulting conviction

17   or sentence a denial of due process. *See, e.g.*, *Wood*, 693 F.3d at 1116-17 (holding

18   allegations of prosecutorial misconduct did not "rise to the level of a due process violation

19   even when considered in the aggregate"). Accordingly, Owens is denied habeas relief as

20   to Ground 2.

21         **C.    Ground 3—Ineffective Assistance of Counsel, Failure to Move to
       Suppress**

22

23         In Ground 3, Owens alleges that trial counsel rendered ineffective assistance by

24   failing to investigate and move to suppress Owens's statements to police. (ECF No. 18

25   at 20-25.) Owens asserts that counsel should have moved to suppress his statements (1)

26   as involuntary, because Owens was intoxicated; and (2) because they were obtained in

27

28

                                             22

1   violation of *Missouri v. Seibert*, 542 U.S. 600, 617 (2004).[8] (*Id.*)

2          In its order granting in part Respondents' motion to dismiss, the Court found that

3   Owens did not fairly present a claim under *Seibert* to the state courts during

4   postconviction proceedings and that Ground 3(B) is unexhausted. (ECF No. 35 at 6.)

5   Although Owens did not suggest any means by which he could overcome the procedural

6   bar in state court or assert a basis to overcome procedural default under *Martinez v.*

7   *Ryan*, 566 U.S. 1 (2012), the Court deferred ruling whether Ground 3(B) must be

8   dismissed as procedurally defaulted until merits review. Owens, however, does not

9   present any cause and prejudice argument to excuse the procedural bar of Ground 3(B)

10  and does not present any arguments relative to *Martinez* regarding Ground 3(B). (ECF

11  No. 59 at 10.) Accordingly, the Court dismisses Ground 3(B) as procedurally defaulted.

### 1.    Additional background information

13         A robbery detective, David Miller, testified at trial on direct examination as follows:

| | |
|---|---|
| **[The State]:** | At some point during the initial contact with [Owens], did you tell him look, I'll talk to you at the Robbery Division Later? |
| **[Witness]:** | That's true, yes. |
| **[The State]:** | Did he continue to speak to you? |
| **[Witness]:** | Yes. |
| **[The State]:** | Unsolicited? |
| **[Witness]:** | Yes. |
| **[The State]:** | Because you wanted to Mirandize him and record the interview later, correct? |
| **[Witness]:** | Right. I wasn't—I was still trying to—I had just woken up frankly. I was—I don't know 3:30, 4:00 in the morning. I was just trying to get the details from those detectives, everything that they saw occur that night and he was just going on and on, you know, stating I'm the one who did it. I already told them. It's all me. I don't want anyone else to go to jail. Things of that nature. |
| | And I was—yeah, I was basically telling him we'll—I promise you I'll talk to you, but let me get some facts and details out |

---

[8]*Seibert* held that *Miranda* warnings mid-interrogation, after a defendant gave unwarned confessions, were ineffective, and thus a confession repeated after warnings was inadmissible at trial. *See* 542 U.S. at 611-17.

1          here and then we'll go back to the office and we'll talk.

2   (ECF No. 22-30 at 68-69.)

3          On cross-examination, Miller testified regarding his interview with Owens:

4   **[Defense]:**          Okay. Now I'm going to throw something out there and then
                            I'm going to ask you based on your training and experience. It
5                           appeared to me in the video that [Owens] was in an altered
                            state, be it drunk or high or something like that. Is that fair to
6                           say?

7   **[Witness]:**          No, not at all. He seemed not—I didn't get that impression, not
                            even slightly. I do interview people who I get that impression
8                           of, but no, I didn't get that impression at all.

9   **[Defense]:**          Okay. So the way he spoke with you colloquially, dropping a
                            lot of F-bombs, doing things like that, that was not out of the
10                          norm for you?

11  **[Witness]:**          Nope.

12  **[Defense]:**          So you believed him to be sober when he was giving those
                            interviews?

13  **[Witness]:**          Yes.

14

15  (ECF No. 22-30 at 141.)

16                    **2.    State court determination**

17         The Nevada Court of Appeals held:

18         Owens claimed his trial counsel was ineffective for failing to investigate the
           circumstances surrounding his confession or file a motion to suppress his
19         confession because his interview with the police was not voluntary. Owens
           contended he was forced to sign documents he did not understand and
20         asserted he was under the influence of a substance during that interview.
           "A confession is admissible only if it is made freely and voluntarily" and
21         "must be the product of a rational intellect and a free will." *Passama v. State*,
           725 P.2d 321, 322 (1987) (internal quotation marks omitted). "Voluntariness
22         must be determined by reviewing the totality of the circumstances," and
           "[t]he ultimate inquiry is whether the defendant's will was overborne by the
23         government's actions." *Gonzalez v. State*, 354 P.3d 654, 658 (Ct. App.
           2015).

24
           Officers testified at trial that upon his arrest, Owens stated he had
25         committed the crimes and offered those statements unprompted. Owens
           also informed a police officer where he had discarded a firearm. An officer
26         testified he subsequently transported Owens to a police station and initiated
           an interview with Owens. The officer advised Owens of his rights pursuant
27         to *Miranda v. Arizona*, 384 U.S. 436 (1966). Owens stated that he
           understood his rights and agreed to talk to the officer. Owens proceeded to
28         discuss his involvement in the robberies in detail and provided clear
           responses to the officer's questions. Owens initialed surveillance

1   photographs after admitting he was the person depicted in them. The record
2   does not reveal that Owens informed the officer that he was under the
    influence of any substance during the interview and Owens did not provide
3   an indication that he was unable to understand the interview process. The
    totality of the circumstances demonstrated that Owens' confession was
4   voluntary and his will was not overborne by the officers' actions.
    Accordingly, Owens did not demonstrate counsel acted in an objectively
5   unreasonable manner by failing to investigate the circumstances
    surrounding his confession or to move to suppress his confession. Owens
6   also did not demonstrate a reasonable probability of a different outcome
    had counsel investigated this issue or moved for suppression of the
7   confession. Therefore, we conclude the district court did not err by denying
    this claim without conducting an evidentiary hearing.

8   (ECF No. 24-36 at 4-6.)

9               **3.    Analysis**

10      The Nevada appellate court's decision is not contrary to, nor an unreasonable

11  application of federal law as determined by the United States Supreme Court and is not

12  based on unreasonable determinations of fact in the state court record.

13      Under *Miranda v. Arizona*, a suspect must be warned that they have the right to

14  remain silent and to the assistance of counsel if they are subjected to custodial

15  interrogation. *See* 384 U.S. at 444. "The defendant may waive effectuation of these rights,

16  provided the waiver is made voluntarily, knowingly and intelligently." *Id*. The waiver must

17  be "voluntary in the sense that it was the product of a free and deliberate choice rather

18  than intimidation, coercion, or deception." *Berghuis v. Tompkins*, 560 U.S. 370, 382

19  (2010). Whether a confession is involuntary must be analyzed within the "totality of the

20  circumstances." *Withrow v. Williams*, 507 U.S. 680, 693 (1993). The factors to be

21  considered include the degree of police coercion; the length, location and continuity of

22  the interrogation; and the defendant's maturity, education, physical condition, mental

23  health, and age. *See id*. at 693-94.

24      Counsel's decision not to move to suppress Owens's statements to police does

25  not fall "outside the wide range of professionally competent assistance." *Strickland*, 466

26  U.S. at 690. As noted by the Nevada appellate court, Owens volunteered that he

27  committed the crimes, and he provided clear responses to the police. The record does

28  not show that Owens informed police that he was under the influence of any substances

1    or that he did not understand the interview process. Miller testified at trial that he believed

2    Owens was sober during his interview. Owens has not demonstrated that a motion to

3    suppress had any likelihood of success. Owens fails to demonstrate that his trial counsel's

4    actions in failing to move to suppress his statements to police fell below an objective

5    standard of reasonableness and that but for the alleged deficiency, a reasonable

6    probability exists that the result of the proceeding would have been different. Accordingly,

7    Owens is denied habeas relief as to Ground 3.

8    **D.    Ground 4—Ineffective Assistance of Counsel, Failure to Challenge Search Warrant**

9

10   In Ground 4, Owens alleges that trial counsel rendered ineffective assistance by

11   failing to investigate and challenge the search warrant. (ECF No. 18 at 25-27.) He asserts

12   that trial counsel should have investigated the probable cause underlying the search

13   warrant for the mobile tracking device. (*Id.* at 26.) He further asserts that probable cause

14   for the search warrant was provided by an "anonymous tipster." (*Id.*)

15   **1.    Additional background information**

16   At trial, Miller testified that during the investigation, detectives received a tip

17   anonymously over the telephone through Crime Stoppers on August 5, 2014. (ECF No.

18   22-30 at 59-60.) When asked if detectives had probable cause to arrest Owens on August

19   5, Miller testified as follows:

20   > I didn't think we had probable cause on the 5th after first receiving that
     > information. I thought we were building our case, trying to determine the
21   > validity of the tip. And of course, it did look like him in those pictures, so it
     > was looking good, but the investigation was ongoing. I wasn't going to go
22   > out that very moment and take him into custody. But I certainly was
     > interested in taking a look at his life and seeing if we could determine if he
23   > was related.

24   (*Id.* at 63.) Miller further testified regarding the surveillance conducted on Owens. (*Id.*) He

25   testified that detectives obtained footage of Owens using the red Prius, which was a rental

26   car. (*Id.* at 64-65.)

27   ///

28   ///

26

### 2.   State court determination

The Nevada Court of Appeals held:

Owens claimed trial counsel was ineffective for failing to investigate the probable cause supporting a search warrant or move to suppress evidence obtained pursuant to the search warrant. The police obtained a warrant to place a tracking device on a vehicle due to information they obtained indicating it was being utilized in the commission of robberies. Owens contended that counsel should have attempted to discover additional information concerning the anonymous source that provided information to the police concerning the robberies and should have argued the warrant was improper because the vehicle was not registered to him.

"[I]nstallation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a search." *United States v. Josh*, 565 U.S. 400, 404 (2012) (internal quotation marks omitted). Non-owners of a vehicle generally do not have standing to challenge the search of that vehicle unless the non-owner has some sort of possessory intent in that vehicle. *Scott v. State*, 877 P.2d 503, 507-08 (1994). Owens made no attempt to demonstrate he had a possessory interest in the vehicle. *See id*. Owens also made no attempt to demonstrate he had a legitimate expectation of privacy in the vehicle. *See Rakas v. Illinois*, 439 U.S. 128, 130 n. 1 (1978) ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure."). Accordingly, Owens did not demonstrate counsel acted in an objectively unreasonable manner by failing to investigate the probable cause supporting the search warrant or by failing to move to suppress the evidence obtained pursuant to the warrant. In addition, Owens did not demonstrate a reasonable probability of a different outcome had counsel performed an investigation or attempted to suppress the evidence obtained from the tracking device. Therefore, we conclude the district court did not err by denying this claim without conducting an evidentiary hearing.

(ECF No. 24-36 at 3-4.)

### 3.   Analysis

Considering the deferential standard set forth in *Strickland*, and the "high level of deference given to counsel's decisions," *Carrera v. Ayers*, 670 F.3d 938, 948 (9th Cir. 2011), *on reh'g en banc*, 699 F.3d 1104 (9th Cir. 2012), the Court finds that the Nevada court of appeals' determination that trial counsel was not deficient for failing to challenge the search warrant was a reasonable application of clearly established federal law. Owens fails to demonstrate that there was a substantial basis to challenge the search warrant and trial counsel was not ineffective for failure to raise an issue that lacks merit. In addition, Owens cannot demonstrate that had trial counsel investigated and challenged

1    the search warrant, the result of the proceeding would have been different, particularly

2    considering Owen's confession that he committed the robberies and witness testimony

3    that likely would not have been excluded based on a successful challenge to the search

4    warrant.

5         The Nevada appellate court's decision is not contrary to, nor an unreasonable

6    application of federal law as determined by the United States Supreme Court and is not

7    based on unreasonable determinations of fact in the state court record. Owens is denied

8    habeas relief as to Ground 4.

9    **E.    Ground 5—Ineffective Assistance re: Failure to Move to Disqualify
     Trial Judge and Change of Venue**

10

11        Finally, in Ground 5, Owens alleges trial counsel rendered ineffective assistance

12   for failure to seek disqualification of the trial judge or a change of venue due to judicial

13   bias. (ECF No. 18 at 27-29.) He asserts that the trial judge had a bias against Owens

14   because he was also the judge that signed the search warrant. (*Id.* at 28.) He further

15   asserts that the trial judge should have recused himself based on his authorization of the

16   search warrant.

17                    **1.    State court determination**

18   The Nevada Court of Appeals held:

19        Owens claimed trial counsel was ineffective for failing to seek
     disqualification of the trial judge or a change of venue because the judge

20        was biased against him. Owens contended the trial judge was biased
     against him because the judge approved the search warrant permitting the

21        police to install the tracking device on a vehicle. However, the "rulings and
     actions of a judge during the course of official judicial proceedings do not

22        establish" that a district court judge was biased against a party. *In re Petition
     to Recall Dunleavy*, 769 P.2d 1271, 1275 (1988). Because the trial judge's

23        approval of the search warrant was insufficient to establish that the judge
     was biased, Owens did not demonstrate counsel's performance fell below

24        an objective standard of reasonableness by failing to seek disqualification
     of the trial judge. Owens also failed to demonstrate a fair and impartial trial

25        could not have been held in Clark County, *see* NRS 174. 455, and,
     therefore, he did not demonstrate counsel should have sought a change of

26        venue. In addition, Owens did not demonstrate a reasonable probability of
     a different outcome had counsel moved for disqualification of the trial judge

27        or a change of venue due to bias toward Owens. Therefore, we conclude
     the district court did not err by denying this claim without conducting an

28        evidentiary hearing.

1   (ECF No. 24-36 at 4.)

2                    **2.    Analysis**

3          The Nevada appellate court's decision is not contrary to, nor an unreasonable

4   application of federal law as determined by the United States Supreme Court and is not

5   based on unreasonable determinations of fact in the state court record.

6                    **a.    Judicial disqualification**

7          "[M]ost matters relating to judicial disqualification [do] not rise to a constitutional

8   level." *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 876 (2009). Under Supreme

9   Court precedent, there are "only three circumstances in which an appearance of bias—

10  as opposed to evidence of actual bias—necessitates recusal": (1) the judge has a

11  pecuniary or personal interest in the outcome of the proceedings, (2) the judge "becomes

12  embroiled in a running, bitter controversy with one of the litigants," or (3) the judge "acts

13  as part of the accusatory process." *Crater v. Galaza*, 491 F.3d 1119, 1130 (9th Cir. 2007)

14  (quoting *Turney v. Ohio*, 273 U.S. 510, 523 (1927)); *Mayberry v. Pennsylvania*, 400 U.S.

15  455, 465 (1971).

16         The Court finds that Owens fails to establish that trial counsel's performance was

17  deficient as a result of failure to object or move to disqualify the trial judge for bias based

18  on his authorization of the search warrant. The Supreme Court has explicitly held that

19  "opinions formed by the judge on the basis of facts introduced or events occurring in the

20  course of the current proceedings, or of prior proceedings, do not constitute a basis for a

21  bias or partiality motion unless they display a deep-seated favoritism or antagonism that

22  would make fair judgment impossible." *Litekey v. United States*, 510 U.S. 540, 555-56

23  (1994) (finding grounds for disqualification asserted by petitioners including "judicial

24  rulings, routine trial administration efforts, and ordinary admonishment (whether or not

25  legally supportable) to counsel and witnesses" were inadequate as "[a]ll occurred in the

26  course of judicial proceedings, and neither (1) relied upon knowledge acquired outside

27  such proceedings nor (2) displayed deep seated and unequivocal antagonism that would

28  render fair judgment impossible"). Owens does not present any evidence of judicial bias,

1    favoritism or antagonism, or improper reliance on knowledge gained from an extrajudicial

2    source that could form the basis of a constitutional claim.

3                          **b.    Change of venue**

4         The Sixth and Fourteenth Amendments "guarantee[ ] to the criminally accused a

5    fair trial by a panel of impartial 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).

6    When a trial court is "unable to seat an impartial jury because of prejudicial pretrial

7    publicity or an inflamed community atmosphere[,] . . . due process requires that the trial

8    court grant defendant's motion for a change of venue." *Harris v. Pulley*, 885 F.3d 1354,

9    1361 (9th Cir. 1988) (citing *Rideau v. Louisiana*, 373 U.S. 723, 726 (1963)).

10        Owens asserts that trial counsel rendered ineffective assistance for failure to seek

11   a change of venue based on a biased judge. (ECF No. 59 at 14-15.) As determined above,

12   Owens failed to demonstrate any evidence of judicial bias to form the basis of a due

13   process violation. As stated by the Nevada court of appeals, Owens also failed to

14   demonstrate a fair and impartial trial could not have been held in Clark County, and,

15   therefore, he did not demonstrate counsel should have sought a change of venue. Owens

16   is denied habeas relief as to Ground 5.

17   **V.    CERTIFICATE OF APPEALABILITY**

18        This is a final order adverse to Petitioner. Rule 11 of the Rules Governing Section

19   2254 Cases requires the Court to issue or deny a certificate of appealability ("COA").

20   Therefore, the Court has *sua sponte* evaluated the claims within the petition for suitability

21   for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner*, 281 F.3d at 864-65. Under

22   28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a

23   substantial showing of the denial of a constitutional right." With respect to claims rejected

24   on the merits, a petitioner "must demonstrate that reasonable jurists would find the district

25   court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*,

26   529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For

27   procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether

28

1   the petition states a valid claim of the denial of a constitutional right and (2) whether this

2   Court's procedural ruling was correct. *Id.*

3       Applying these standards, this Court finds that a certificate of appealability is

4   unwarranted.

5   **VI.    CONCLUSION**

6       It is therefore ordered that the Amended Petition for Writ of Habeas Corpus under

7   28 U.S.C. § 2254 (ECF No. 18) is granted as to Ground 1 and denied as to the remaining

8   grounds. Petitioner Darian Owens's sentence in Case No. C-14-300761-1 in the Eighth

9   Judicial District of Nevada is hereby vacated. Within 60 days[9] of the later of (1) the

10  conclusion of any proceedings seeking appellate or certiorari review of this Court's

11  judgment, if affirmed; or (2) the expiration for seeking such appeal or review, Owens must

12  be given new sentencing hearing.

13      It is further ordered that a certificate of appealability is denied.

14      The Clerk of Court is directed to (1) substitute Jeremy Bean for Respondent

15  Gittere; (2) enter judgment accordingly; (3) provide a copy of this order and the judgment

16  to the Clerk of the Eighth Judicial District Court of Nevada in connection with that court's

17  Case No. C-14-300761-1; and (4) close this case.

18      DATED THIS 7th Day of February 2025.

19

20  _____
    MIRANDA M. DU
21  UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28
    _____
    [9] Reasonable requests for modification of this time may be made by either party.